**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| KAYE SANDERSON,  MARIAN LYONS, and LIESEL HUNTER<br><br>             Plaintiffs,<br><br>            v.<br><br>LEAVITT GROUP INSURANCE ADVISORS,<br><br>             Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:14-cv-571<br><br>Judge Robert J. Shelby |

        This is an employment-discrimination case.  Plaintiffs Kaye Sanderson, Marian Lyons,

and Liesel Hunter allege that Defendant Leavitt Group Insurance Advisors discriminated against

them on the basis of age in violation of the Age Discrimination in Employment Act (ADEA).

Leavitt Group has filed separate Motions for Summary Judgment regarding the claims asserted

by each of the three Plaintiffs.  For the reasons stated below, the court grants Leavitt Group's

motions related to Ms. Sanderson and Ms. Hunter and dismisses their claims.  The court denies

Leavitt Group's motion related to Ms. Lyons.

## BACKGROUND

### I.  Parties

        Leavitt Group is a Utah insurance agency.  The agency sells both commercial lines of

insurance (e.g., premises liability and fire protection) and personal lines of insurance (e.g.,

homeowners and automobile insurance).  Leavitt Group is part of a larger company named

Leavitt Group Enterprises (LGE), which owns a majority interest in a number of insurance

agencies.  LGE and three other investors acquired Leavitt Group from Zions Bank in 2007.  At

1

the time of the acquisition, the agency was operating under the name of Grant Hatch & Associates.

Plaintiffs in this case are three former Leavitt Group employees. Ms. Sanderson was a personal-line producer. Her primary responsibility was to sell insurance policies to individuals. Ms. Lyons was a commercial-line producer whose job was to sell insurance policies to companies. Ms. Hunter was a customer service representative who was tasked with assisting personal-line producers and providing customer support to clients.

## II. Middle-Market Initiative

In 2011, LGE launched a middle-market initiative in a number of its agencies. The new program applied to the commercial-line group and aimed at developing long-term relationships with large companies that had complex insurance needs. In June 2012, Leavitt Group hired David Bashford as its president and tasked him with implementing the middle-market initiative within Leavitt Group. Although the middle-market initiative pertained to commercial-line producers, Leavitt Group also increased sales goals for its personal-line producers.

Plaintiffs assert that the middle-market initiative caused discriminatory treatment against older employees. They present evidence that Mr. Bashford associated with younger employees more than he associated with older employees and that he sought to hire young commercial-line producers. They also submit evidence that Mr. Bashford created an A Team and a B Team within the commercial group, that employees over forty-years old were disproportionately placed on the B Team, and that Mr. Bashford personally managed the A Team and took the younger producers to seminars and events to which the B Team not invited.

2

### III. Terminations

The middle-market initiative eventually led to layoffs in November 2012.  Leading up to the layoffs, Mr. Bashford met with a number of managers within Leavitt Group to discuss which employees the agency would terminate.  Leavitt Group ultimately fired Ms. Sanderson, Ms. Lyons, and Ms. Hunter, among others.

#### A.  Kaye Sanderson

Ms. Sanderson was primarily a personal-line producer at Leavitt Group, meaning she sold personal-line policies and provided services to individual clients.  She worked at Grant Hatch at the time LGE acquired it from Zions Bank.  Ms. Sanderson was forty-nine years old when Leavitt Group fired her.  She claims that Leavitt Group violated the ADEA by terminating her because of her age and by discriminating against her leading up to the termination.

When Ms. Sanderson was fired, Leavitt Group retained two personal-line producers, Richard Forster (age sixty-six) and Parks Mangelson (age fifty-two).  Mr. Mangelson was a personal-line producer and was also part of the Leavitt Group management team.  Leavitt Group also retained Devin Moyer as a customer service representative.  There is no evidence that Leavitt Group promoted him to be a personal-line producer.  However, Leavitt Group began requiring Mr. Moyer, along with other customer service representatives, to write insurance policies for cold callers.  The agency received approximately two or three cold calls per week, and a small percentage of cold callers actually purchased a policy.  If the agency wrote a policy, the account became a "house account," meaning the employee who wrote the policy would not gain the new client or receive a commission.  In the past, Leavitt Group allowed producers to write policies for cold callers.  Although the producers did not gain a new client or commission, they often asked the cold caller for referrals.

3

In May 2013, months after Ms. Sanderson's termination, Leavitt Group hired Ryan Davis to manage the business affairs related to the agency's personal-line group. Mr. Davis was tasked solely with managing the business; he did not sell insurance policies. Leavitt Group delegated management responsibilities to Mr. Davis to give Mr. Mangelson more time to pursue new clients. Ms. Sanderson submits no evidence regarding Mr. Davis's age, except to assert that he is younger than her.

There is no evidence that Leavitt Group hired a personal-line producer after Ms. Sanderson's termination.

**B. Marian Lyons**

Ms. Lyons was a commercial-line producer at Leavitt Group. At the time of her termination, she was fifty-eight years old and had been an insurance agent for nearly twenty years. Immediately before Leavitt Group terminated Ms. Lyons, six of the nine commercial-line producers at the agency were over forty years old. Leavitt Group terminated four commercial-line producers over forty and one under forty. Of the four commercial-line producers that Leavitt Group retained, two were over forty and two were under forty. Nathan Call was the only employee under forty that Leavitt Group terminated. Ms. Lyons contends that Leavitt Group offered Mr. Call his job back shortly after the discharge. However, Ms. Lyons's proffered evidence shows that Mr. Call received an offer to join another agency within LGE that was not Leavitt Group.

Ms. Lyons testified in her deposition that Mr. Bashford stated in a staff meeting that he planned to hire "young producers" as part of the middle-market initiative. Additionally, weeks before the terminations, Leavitt Group held two meetings (October 16, 2012 and October 30, 2012) in which the attendees discussed the middle-market initiative, the terminations, and plans

4

to hire new employees.  Ms. Lyons submits meeting minutes from those two meetings, but it is unclear who attended or participated.  The meeting minutes list the employees that Leavitt Group planned to terminate and stated that the agency planned to hire "6 new associate Producers."  The minutes also state, "When hiring new Associates - 2 years out of college, have business experience, is discipline [sic] and coachable . . . ."

The meeting minutes also referenced Joe Teed, a commercial-line producer that Leavitt Group had recently hired.  The agency offered Mr. Teed a position in October 2012, weeks before Ms. Lyons's termination.  Mr. Teed joined the agency in December 2012.  The hiring was part of the middle-market initiative, which focused on the commercial-line group.  Mr. Teed was born April 18, 1984, making him twenty-eight years old at the time Leavitt Group hired him.

### C.  Liesel Hunter

Ms. Hunter was a personal-line customer service representative at Leavitt Group.  When Leavitt Group terminated her, she was fifty-eight years old and had been with the agency and its predecessors for twenty-eight years.  Shortly before Ms. Hunter's termination, Leavitt Group employed two other personal-line customer service representatives, Mr. Moyer (age twenty-eight) and Audra Crizer (age thirty-three).  Leavitt Group retained both Mr. Moyer and Ms. Crizer.

Mr. Mangelson, a personal-line producer that also managed the personal-line group, stated in a declaration that Ms. Crizer was more efficient and more willing to take on responsibility than Ms. Hunter.  Mr. Mangelson also stated that Mr. Moyer had advanced telephone-service and computer skills that were "ideal" for assisting with the large volume of calls that Leavitt Group received after firing Ms. Hunter.

## ARGUMENT

### I.  Legal Standard

Federal Rule of Civil Procedure 56 governs summary judgment.  The rule establishes that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  The court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."[2] Importantly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[3]

Rule 56 allows a party to object to cited factual materials that "cannot be presented in a form that would be admissible in evidence."[4]  Leavitt Group raised several objections in its reply memoranda regarding Plaintiffs' statements of fact.  Many of the objections are well taken, and the court constrains its analysis to factual materials that are relevant and admissible.

### II.  Age Discrimination in Employment Act

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[5]  The Tenth Circuit requires that a plaintiff show but-for causation.[6]  That is, a plaintiff must show that her age was the reason the employer decided to act and "the factor that made a difference."[7]

---

[1] FED. R. CIV. P. 56(a).
[2] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).
[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[4] FED. R. CIV. P. 56(c)(2).
[5] 29 U.S.C. § 623(a)(1).
[6] *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 949–50 (10th Cir. 2011).
[7] *Id.* at 950; *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010).

A plaintiff can survive summary judgment by showing direct or circumstantial evidence of discrimination.[8]  There is no direct evidence of discrimination in this case.  Thus, Plaintiffs must show discrimination through circumstantial evidence under the *McDonnell Douglas* framework.[9]  To do this, a plaintiff must first make a prima facie case of unlawful discrimination.[10]  If the plaintiff does so, "the burden of production then shifts to the employer to identify a legitimate, nondiscriminatory reason for the adverse employment action."[11]  If the employer identifies a nondiscriminatory reason for the adverse employment action, "the burden shifts back to the plaintiff to prove the employer's proffered reason was pretextual."[12]

### A.  Kaye Sanderson

#### 1.  Prima Facie Showing

Leavitt Group maintains that Ms. Sanderson's discharge was part of a reduction in force (RIF) prompted by the middle-market initiative.  To make a prima facie case of age discrimination in the RIF context, a plaintiff must show that she "(i) was within a protected age group, (ii) was doing satisfactory work, (iii) was discharged despite the adequacy of . . . her work, and (iv) has *some* evidence the employer intended to discriminate against . . . her in reaching its RIF decision."[13]

Ms. Sanderson contends that the RIF prima facie elements are overly narrow because her claim is that Leavitt Group discriminated against her in employment practices leading up to her termination.  As an alternative, she puts forth a broader test generally reserved for "addressing discrimination claims that either do not fall into any of the traditional categories (e.g., hiring or

---

[8] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003).
[9] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Jones*, 617 F.3d at 1278.
[10] *Jones*, 617 F.3d at 1278.
[11] *Id.*
[12] *Id.*
[13] *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008); *see also Paup v. Gear Products, Inc.*, 327 F. App'x 100, 108 (10th Cir. 2009).

discharge) or present unusual circumstances."[14]   Under the broader prima facie test, a plaintiff

must show only that "(i) she belongs to a protected class; (ii) she was qualified and satisfactorily

performing her job; and (iii) she was terminated under circumstances giving rise to an inference

of discrimination."[15]   But Ms. Sanderson's claim is a termination claim.  And the Tenth Circuit

has repeatedly applied the RIF prima facie standard in termination cases.[16]   Although Ms. Lyons

submits evidence of Leavitt Group's discriminatory employment practices to serve as proof of

discriminatory intent, her claim hinges on whether Leavitt Group discriminated against her when

it fired her.  Ms. Sanderson's counsel confirmed as much at the hearing on the Motion.  The court

is reticent to depart from the established standard, and concludes that this case does not present

the kind of unusual circumstances that warrant a departure under Tenth Circuit law.  The court

opts to follow the four-part RIF test, which provides "more structure and guidance."[17]

The parties do not dispute that Ms. Sanderson makes an adequate showing regarding the

first three prongs.  She was within the protected age group, did satisfactory work, and was

discharged.  The parties dispute whether Ms. Sanderson has satisfied the fourth element, which

requires her to show that "the employer intended to discriminate against . . . her in reaching its

RIF decision."[18]

A plaintiff may satisfy the fourth factor by showing that she was terminated as part of a

RIF in which younger employees were retained in a similar position.[19]   Ms. Sanderson has failed

to submit competent evidence that Leavitt Group retained a younger employee in a similar

position.  She submits evidence that Leavitt Group retained Mr. Moyer, age twenty-eight, as a

---

[14] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 n.6 (10th Cir. 2000).
[15] *Martin v. Nannie & Newborns, Inc.*, 3 F.3d 1410, 1417 (10th Cir. 1993).
[16] *E.g., Hinds*, 523 F.3d at 1195; *Paup*, 327 F. App'x at 108; *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998).
[17] *Kendrick*, 220 F.3d at 1227 n.6.
[18] *Hinds*, 523 F.3d at 1195; *see also Paup*, 327 F. App'x at 108.
[19] *Hinds*, 523 F.3d at 1195; *see also Paup*, 327 F. App'x at 109.

customer service representative.  Mr. Moyer was assigned to assist Ms. Sanderson, and there is

no evidence that Mr. Moyer became a producer after Ms. Sanderson's termination.  Although

customer service representatives and producers work closely with one another, they did not

occupy a similar position for purposes of the ADEA.  Customer service representatives were

responsible for customer service and assisting producers; producers were responsible for sales.

The subject matter and some tasks are related, but the two positions have different core

responsibilities and pay structures.  Ms. Sanderson asserts that Mr. Moyer occupied a similar

position because Leavitt Group permitted him to write policies for cold callers.  However, Mr.

Moyer did not receive a commission for writing those policies and the agency received a small

number of cold calls per week.  Simply put, Leavitt Group did not alter the core responsibilities

of customer service representatives or producers when it reassigned the task of writing policies

for cold callers.  Thus, evidence that Leavitt Group retained Mr. Moyer is immaterial because he

did not occupy a similar position as Ms. Sanderson occupied.[20]

Ms. Sanderson also argues that Leavitt Group's employment practices discriminated

against her on the basis of age.  Ms. Sanderson submits evidence that Leavitt Group increased

sales goals for personal-line producers then assigned Ms. Sanderson a new customer service

representative, Mr. Moyer, with no experience in the insurance industry.  Ms. Sanderson asserts

that Mr. Moyer could not adequately provide customer service to her clients, forcing her to spend

a disproportionate amount of time on customer service instead of sales.  Ms. Sanderson claims

that the increased sales goals, coupled with an inexperienced customer service representative,

impacted her unfairly as an older worker because she had a larger book of business and therefore

---

[20] Ms. Sanderson also puts forth evidence that Leavitt Group replaced her by hiring Ryan Davis.  But Ms.
Sanderson submits no evidence regarding Mr. Davis's age.  She only claims, without citation to record evidence, that
he is younger than her.  Further, Mr. Davis was not a personal-line producer.  Therefore, evidence of Leavitt Group
hiring Mr. Davis is immaterial.

more existing clients for whom she had to provide customer service.  This resulted in Ms.
Sanderson spending more time on customer service and less time on sales.  Lastly, Ms.
Sanderson asserts that Leavitt Group determined that she could not succeed and fired her before
she was given an opportunity to perform under the new sales goals.

At bottom, Ms. Sanderson maintains that Leavitt Group treated her unfairly by creating
unrealistic sales goals while at the same time making it more difficult for her to actually focus on
sales.  As she puts it, Leavitt Group set her up to fail.  Perhaps there is substance to these
grievances. What matters in this case, however, is whether Ms. Sanderson has submitted
evidence to satisfy the fourth prong of the RIF prima facie standard that shows "the employer
intended to discriminate against . . . her in reaching its RIF decision."[21]  The ADEA prohibits
employers from discriminating against employees belonging to the protected class (i.e., over
forty years old).  Discrimination means differential treatment.[22]  It occurs when an individual that
belongs to a certain group—in this case, employees over forty years old—is treated less
favorably than other individuals that do not belong to that group.  Leavitt Group employed three
personal-line producers, including Ms. Sanderson.  All three were over forty years old, and Ms.
Sanderson was the youngest among them.  The agency retained the two older personal-line
producers:  Richard Forster (age sixty-six) and Parks Mangelson (age fifty-two).  The fact that
Leavitt Group retained the older producers negates any argument that the agency treated Ms.
Sanderson less favorably than younger personal-line producers.  In view of this, Ms. Sanderson
has failed to show that Leavitt Group intended to discriminate against her on the basis of age.

But even if Ms. Sanderson met her prima facie burden, she has not shown that Leavitt
Group's nondiscriminatory reason for firing her was pretext for discrimination.  The court lays

---

[21] *Hinds*, 523 F.3d at 1195; *see also Paup*, 327 F. App'x at 108.
[22] *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

out Leavitt Group's proffered nondiscriminatory reason for firing Ms. Sanderson and Ms. Sanderson's pretext argument in turn.

### 2.   Nondiscriminatory Reason for Discharge

Leavitt Group asserts that the agency decided to terminate Ms. Sanderson after the management team determined that she was unlikely to meet the agency's increased production goals.

### 3.   Pretext

A plaintiff can survive summary judgment by presenting evidence of pretext that shows "such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[23]  A plaintiff must show that age was the but-for cause of the discrimination, meaning it was the "factor that made a difference."[24]  The court considers whether the decision maker fairly believed her decisions and acted in good faith—without considering whether the decisions were "wise, fair or correct."[25]

"Once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment."[26] To evaluate the sufficiency of the evidence, courts in the Tenth Circuit look to several factors, "'includ[ing] the strength of the [employee's] prima facie case, the probative value of the proof

[23] *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010) (quoting *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005)).
[24] *Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 949–50 (10th Cir. 2011).
[25] *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004).
[26] *Jones*, 617 F.3d at 1280 (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005)).

that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered' on a motion for summary judgment."[27]

Ms. Sanderson was the youngest personal-line employee that Leavitt Group terminated. She urges the court to look past that fact and consider the agency's alleged overarching plans to unfavorably treat and discharge older employees.  She asserts, among other things, that she was more productive than the two personal-line producers that Leavitt Group retained; that the Leavitt Group made its RIF decision based on inaccurate performance reports; that Leavitt Group did not give her a meaningful opportunity to succeed under the agency's "new direction," which included increased sales goals; that Leavitt Group's employment practices stemming from the middle-market initiative had a disparate impact on older employees; that Leavitt Group treated older and younger workers differently; that Leavitt Group did not conduct a proper investigation before terminating her; and that Leavitt Group applied inconsistent criteria when deciding which employees to terminate.

The ADEA protects certain employees from less favorable treatment than other similarly situated, nonprotected employees.  Ms. Sanderson submits no evidence regarding differential treatment of employees that were similarly situated to her.  Even if her assertions stated above are taken as true, they do not sufficiently call into question Leavitt Group's nondiscriminatory reason for her discharge because they do not say anything about differential treatment between Ms. Sanderson and a nonprotected, similarly situated employee.  It is undisputed that Leavitt Group employed three personal-line producers that were all over forty years old, fired the youngest among them, and retained the two older producers.  Ms. Sanderson has not shown that Leavitt Group treated her less favorably in comparison to the other personal-line producers. Further, she has not shown that her age was the factor that drove the agency's decision to fire her.

---

[27] *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148–49 (2000)).

Therefore, the court grants summary judgment in favor of Leavitt Group and dismisses Ms. Sanderson's claim.

### B.  Marian Lyons

#### 1.  Prima Facie Showing

Leavitt Group does not assert that Ms. Lyons's termination was part of a RIF.  Rather, Leavitt Group submits that the termination was a regular termination for purposes of the ADEA. To establish a prima facie case of discrimination, Ms. Lyons must show that "(1) [she] is within the protected age group; (2) [she] was doing satisfactory work; (3) [she] was discharged; and (4) [her] position was filled by a younger person."[28]  Ms. Lyons has the burden of presenting "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . ."[29]  Leavitt Group does not dispute that Ms. Lyons was within the protected age group, that she was doing satisfactory work, and that she was discharged.

Regarding the final element, it is undisputed that Leavitt Group hired a twenty-eight-year-old commercial-line producer, Mr. Teed.  Leavitt Group extended an offer of employment to Mr. Teed in October 2012, weeks before Ms. Lyons's termination.   Mr. Teed joined the agency in December 2012.  The court concludes that Ms. Lyons has made a prima facie case of discrimination.

---

[28] *Rivera*, 365 F.3d at 920.  Leavitt Group recites a more general, three-part test requiring a plaintiff to show "(1) she belongs to a protected class; (2) she was qualified for her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination."  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 n.6 (10th Cir. 2000).  The Tenth Circuit court traditionally follows the four-part test articulated above, but the "three-part test may occasionally be helpful when addressing discrimination claims that either do not fall into any of the traditional categories (e.g., hiring or discharge) or present unusual circumstances."  *Id.*  Leavitt Group does not articulate why the court should depart from the traditional four-part test on the facts here presented.

[29] *O'Connor*, 517 U.S. at 312–13.

### 2. Nondiscriminatory Reason for Discharge

Leavitt Group contends that it terminated Ms. Lyons because she was not generating as much business as other producers and she could not succeed under the middle-market initiative. The agency also argues that Ms. Lyons's lack of productivity resulted from her inability to work while she recovered from injuries sustained in an automobile accident.  Ms. Lyons does not dispute that Leavitt Group has articulated a legitimate, nondiscriminatory reason for terminating her.  She argues instead that Leavitt Group's purported nondiscriminatory reasons were mere pretext.

### 3. Pretext

As stated, a plaintiff's claim survives summary judgment if she can present evidence that shows the employer's proffered nondiscriminatory reasons are weak, implausible, inconsistent, incoherent, or contradictory to the point that they are unbelievable.[30]  Ms. Lyons has put forth sufficient evidence to make this showing.  On the one hand, Leavitt Group presents evidence that Ms. Lyons was generating less business than other producers and likely could not—based on her previous performance—meet the yearly sales goals connected to the middle-market initiative. On the other hand, Ms. Lyons submits evidence that Leavitt Group carried out a plan to hire younger commercial-line producers, and that the job candidate's age influenced hiring decisions. This evidence includes Mr. Bashford's statements that the agency planned to hire younger producers and meeting minutes stating that the agency was seeking to hire producers that were two years out of college.  Ms. Lyons also presents evidence that Leavitt Group followed through with the plan by offering employment to a twenty-eight-year-old producer weeks before discharging Ms. Lyons.

---

[30] *Jones*, 617 F.3d at 1280.

This evidence creates a genuine dispute regarding the sincerity of Leavitt Group's proffered nondiscriminatory reason for firing Ms. Lyons.  Of course, a company may replace its employees with what it perceives to be better-qualified employees.  However, when the company bases its hiring and firing decisions on age, it implicates the ADEA.  The court concludes that Ms. Lyons has presented evidence "sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason."[31]  In other words, "a reasonable factfinder could rationally find . . . that [Leavitt Group] did not act for the asserted non-discriminatory reasons."[32]  The court denies Leavitt Group's Motion for Summary Judgment on Ms. Lyons's ADEA claim for discriminatory discharge.

### C.  Liesel Hunter

#### 1.  Prima Facie Showing

As noted above, Ms. Hunter was a customer service representative when she was fired. Leavitt Group asserts that Ms. Hunter's termination was part of a RIF.  To establish a prima facie case in the RIF context, a plaintiff must show that she "(i) was within a protected age group, (ii) was doing satisfactory work, (iii) was discharged despite the adequacy of . . . her work, and (iv) has some evidence the employer intended to discriminate against . . . her in reaching its RIF decision."[33]

Leavitt Group does not meaningfully argue that Ms. Hunter has failed to make a prima facie case of discrimination.  Additionally, Ms. Hunter has submitted sufficient evidence to at least create a genuine dispute of material facts regarding her prima facie showing.  Ms. Hunter was older than forty years old, received good reviews, and was terminated.  Also, Leavitt Group

---

[31] *Id.*
[32] *Id.*
[33] *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008); *see also Paup v. Gear Products, Inc.*, 327 F. App'x 100, 108 (10th Cir. 2009).

retained both Mr. Moyer and Ms. Crizer.  Both Mr. Moyer and Ms. Crizer were under forty years old and held the same position as Ms. Hunter.

### 2.  Nondiscriminatory Reason for Discharge

Leavitt Group contends that it terminated Ms. Hunter after concluding that her performance was inefficient and that she was reluctant to take on more responsibility, like writing insurance policies for cold callers.  Ms. Hunter does not dispute that Leavitt Group has articulated a legitimate, nondiscriminatory reason for terminating her, but contends that Leavitt Group's purported nondiscriminatory reasons were mere pretext.

### 3.  Pretext

An employee resisting summary judgment must submit evidence that the employer's proffered nondiscriminatory reasons are pretext for discrimination.[34]  Ms. Hunter advances a number of arguments concerning Leavitt Group's proffered nondiscriminatory reasons for discharging her.  She argues that she was more experienced and better qualified than the customer service representatives that Leavitt Group retained.  However, Ms. Hunter's beliefs regarding her relative qualifications and performance are irrelevant—"[i]t is the manager's perception of the employee's performance that is relevant."[35]  Leavitt Group has submitted evidence that its managers believed Ms. Crizer was more efficient than Ms. Hunter and more willing to take on responsibilities.  Leavitt Group has also presented evidence that Mr. Moyer has particular skills that are well suited for handling a high volume of customer calls.  In sum, Ms. Hunter's subjective evaluation of her relative qualifications is not enough to survive summary judgment because such evidence is not relevant to the analysis.

---

[34] *Jones*, 617 F.3d at 1280.
[35] *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996).

Ms. Hunter next attempts to show pretext by presenting evidence that Leavitt Group's employment practices stemming from the middle-market initiative had a disparate impact on older employees.  As stated above, a plaintiff making a disparate-impact argument must show that the employer treated her differently than it treated other nonprotected, similarly situated employees.[36]  Ms. Hunter was a personal-line customer service representative and was not similarly situated with the employees that the middle-market initiative affected in the commercial-line group.

Next, Ms. Hunter argues that Leavitt Group treated older and younger workers differently.  She submits evidence that Leavitt Group's management team referred to members of the B Team as "seniors," Mr. Bashford expressed that he wanted to hire young commercial-line producers, and Leavitt Group gave certain producers inexpensive pens as awards at a company meeting.  Ms. Hunter submits no evidence regarding differential treatment of employees that were similarly situated to her as a personal-line customer service representative.  Evidence regarding alleged unfair or derogatory treatment among producers (mostly among commercial-line producers) is insufficient to show pretext.

Ms. Hunter also argues that Leavitt Group's failure to conduct an adequate pretermination investigation shows pretext.  Ms. Hunter contends that Leavitt Group failed to investigate when it did not first inform her that her job was in jeopardy.  The cases Ms. Hunter cites are factually inapposite in that they involve an employer firing an employee based on perceived unacceptable

---

[36] To support this proposition, Leavitt Group cites an unpublished Fifth Circuit case, *Kean v. Jack Henry & Assocs., Inc.*, 577 F. App'x 342, 347 (5th Cir. 2014) even though there are published Fifth Circuit cases, and—more importantly—Tenth Circuit cases that stand for the same proposition. *E.g., Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007); *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 353 (5th Cir. 2007); *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 921 (10th Cir. 2004); *Braun v. St. Pius X Parish*, 509 F. App'x 750, 753–55 (10th Cir. 2013).

behavior during a single incident.[37]  In other words, the terminations were disciplinary and the employees argued that the employers did not adequately investigate the incidents at issue.  In contrast, Leavitt Group fired Ms. Hunter based on its belief that Ms. Hunter's performance was deficient.  The termination was not based on a single incident that required an investigation into separate accounts of the incident from the parties involved.  And Ms. Hunter cites no case standing for the proposition that the ADEA requires employers to inform employees that their jobs are in jeopardy based on performance deficiencies.

Lastly, Ms. Hunter contends that Leavitt Group applied its termination criteria inconsistently.  Ms. Hunter argues that Leavitt Group's pretext is demonstrated by the fact that the agency retained customer service representatives with less experience and fewer qualifications.  As stated above, Ms. Hunter's subjective evaluation of her own experience and qualifications is irrelevant—it's Leavitt Group's belief that counts.  Further, Ms. Hunter does not refute that Leavitt Group sincerely believed that Mr. Moyer and Ms. Crizer were better suited to continue with the agency.  Leavitt Group retained Mr. Moyer based on his specialized computer skills.  Leavitt Group retained Ms. Crizer based on her willingness to take on new work and her efficiency.  In short, Ms. Hunter has not presented any relevant evidence showing that Leavitt Group objectively misjudged Ms. Hunter's performance or suitability.

In sum, Ms. Hunter has failed to submit sufficient evidence to show that Leavitt Group's proffered nondiscriminatory reasons for discharging her were mere pretext.  The court grants summary judgment in favor of Leavitt Group on Ms. Hunter's ADEA claim for discriminatory discharge.

---

[37] *See Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542–43 (10th Cir. 2014); *Estate of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1239–40 (10th Cir. 2014).

### III.  Damages

#### A.  Lost Benefits

Plaintiffs bringing ADEA claims may seek to recover damages based on lost fringe benefits.[38]  A plaintiff may seek "amounts owing to [the plaintiff] as a result of a violation" of the ADEA.[39]  The court has broad discretion to fashion remedies aimed at making whole victims of discrimination.[40]  As Ms. Lyons is the sole remaining plaintiff in light of the analysis above, the court confines its damages analysis to her claims.

Ms. Lyons's damages expert included in her calculations the cost of replacing disability and life insurance.  Ms. Lyons did not obtain replacement disability or life insurance after she was terminated.  Leavitt Group argues that Ms. Lyons may recover only the out-of-pocket costs paid to obtain a fringe benefit.  The parties do not cite to Tenth Circuit authority directly on point.  Ms. Lyons cites *Munnelly v. Memorial Sloan Kettering Cancer Center*,[41] a case from the Southern District of New York.  There, the court allowed the plaintiff to seek damages "for the cost of a life insurance package comparable to that which he received through his previous employer, even if he does not actually procure such comparable insurance, provided that he makes diligent efforts to do so."[42]

Leavitt Group, on the other hand, cites *Galindo v. Stoody Co.*,[43] a Ninth Circuit case, in which the court limited damages for lost benefits to out-of-pocket expenses.[44]  The court held that "a plaintiff should be compensated for the loss of those benefits if the plaintiff has purchased substitute insurance coverage or has incurred, uninsured, out-of-pocket medical expenses for

---

[38] *See Blim v. W. Elec. Co.*, 731 F.2d 1473, 1480 (10th Cir. 1984).
[39] 29 U.S.C. § 626(b); *see also Blim*, 731 F.2d at 1480.
[40] *Cf. United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 949 (10th Cir. 1979); *Cooper v. Cobe Labs., Inc.*, 743 F. Supp. 1422, 1434 (D. Colo. 1990).
[41] 741 F. Supp. 60 (S.D.N.Y. 1990).
[42] *Id.* at 64.
[43] 793 F.2d 1502 (9th Cir. 1986).
[44] *Id.* at 1517.

which he or she would have been reimbursed under the employer's insurance plan."[45]  The court concluded that awarding damages for lost benefits that a plaintiff did not purchase "would make a plaintiff more than whole."[46]

The court applies the Ninth Circuit's approach and concludes that Ms. Lyons may seek damages only for out-of-pocket expenses for lost benefits.  Although Ms. Lyons was left without fringe benefits after Leavitt Group fired her, there is no evidence that she incurred any damages as a result.  Fringe benefits certainly have an economic value, as evidenced by consumers' willingness to purchase them.  However, Ms. Lyons has not shown that the absence of benefits injured her.  In other words, she has not shown that she was forced to incur out-of-pocket costs that she otherwise would not have had to incur if her fringe benefits were still in place.  Without proof of out-of-pocket expenses, the only other apparent bases to award damages related to her lost fringe benefits would be punitive (i.e., punishing Leavitt Group for keeping funds that would have paid for Ms. Lyons's benefits) or compensatory (i.e., compensating Ms. Lyons for emotional harm resulting from losing the security provided by the benefits).  As discussed below, the ADEA does not permit punitive or compensatory damages.  The court concludes that Ms. Lyons may seek damages for out-of-pocket costs paid to obtain fringe benefits.

### B.  Compensatory and Punitive Damages

Leavitt Group contends that Plaintiffs cannot recover compensatory or punitive damages under the ADEA.  The Tenth Circuit has held that the ADEA does not permit recovery of compensatory damages.[47]  Further, the Tenth Circuit has held that plaintiffs cannot recover

---

[45] *Id.*

[46] *Id.*

[47] *Ridgell-Boltz v. Colvin*, 565 F. App'x 680, 683 (10th Cir. 2014) (unpublished); *Villescas v. Abraham*, 311 F.3d 1253, 1259–60 (10th Cir. 2002).

punitive damages for ADEA claims.[48]  However, the statute provides liquidated damages for

willful violations, and such damages may be used to punish willful violators.[49]  Thus, Ms.

Sanderson may seek liquidated damages in accordance with 29 U.S.C. §§ 216(b), 626(b).

## CONCLUSION

For the reasons stated, the court GRANTS Leavitt Group's Motions for Summary

Judgment regarding the claims asserted by Ms. Sanderson and Ms. Hunter (Dkt. Nos. 27 and 29)

and DENIES Leavitt Group's Motion for Summary Judgment regarding Ms. Lyons (Dkt. 28).

Ms. Sanderson's and Ms. Hunter's ADEA claims are DISMISSED.

SO ORDERED this 9th day of September, 2015.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[48] *Bruno v. W. Elec. Co.*, 829 F.2d 957, 967 (10th Cir. 1987).
[49] *Id.*

21